# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UMG RECORDINGS, INC, CAPITOL RECORDS, LLC, CONCORD BICYCLE ASSETS, LLC, CMGI RECORDED MUSIC ASSETS LLC, SONY MUSIC ENTERTAINMENT, and ARISTA MUSIC <br><br> Plaintiffs, <br><br> v. <br><br> INTERNET ARCHIVE, BREWSTER KAHLE, KAHLE/AUSTIN FOUNDATION, GEORGE BLOOD, and GEORGE BLOOD, L.P. <br><br> Defendant. | Civil Action No. 23-cv-7133 <br><br> **COMPLAINT** <br><br> TRIAL BY JURY DEMANDED |

Plaintiffs UMG Recordings, Inc. ("UMG"), Capitol Records, LLC ("Capitol Records" and with UMG, "Universal"), Concord Bicycle Assets, LLC ("CBA"), CMGI Recorded Music Assets LLC ("CMGI" and with CBA, "Concord"), Sony Music Entertainment ("SME"), and Arista Music ("Arista Music" and with SME, "Sony") (collectively, "Plaintiffs"), by and through their attorneys, for their Complaint against Defendants Internet Archive, Brewster Kahle ("Kahle"), the Kahle/Austin Foundation (the "Foundation"), George Blood ("Blood"), and George Blood LP ("GBLP") (collectively, "Defendants"), allege, on personal knowledge as to matters relating to themselves and on information and belief as to all other matters, as set forth below:

## NATURE OF THE ACTION

1.      Plaintiffs bring this suit to address Defendants' massive ongoing violation of Plaintiffs' rights in protected pre-1972 sound recordings.  As part of what Defendants have

1

dubbed the "Great 78 Project," Internet Archive, Blood, and GBLP have willfully reproduced thousands of Plaintiffs' protected sound recordings without authorization by copying physical records into digital files. Internet Archive then willfully uploaded, distributed, and digitally transmitted those illegally copied sound recordings millions of times from Internet Archive's website. Kahle, the Foundation, Blood, and GBLP have knowingly and materially contributed to Internet Archive's immense infringement.

2. Defendants' blatant infringement includes hundreds of thousands of works by some of the greatest artists of the Twentieth Century, including: Frank Sinatra, Thelonious Monk, Ella Fitzgerald, Billie Holiday, Miles Davis, and Louis Armstrong, among many other similarly iconic musicians. Examples of iconic recordings available on the Great 78 Project include "White Christmas" by Bing Crosby, "Sing, Sing, Sing" by Benny Goodman, "Peggy Sue" by Buddy Holly, "Roll Over Beethoven" by Chuck Berry, "I've Got the World on a String" by Frank Sinatra, "The Christmas Song" by Nat King Cole, "It Don't Mean a Thing (If It Ain't Got That Swing)" by Duke Ellington, and "Milestones" by Miles Davis.

3. Defendants attempt to defend their wholesale theft of generations of music under the guise of "preservation and research," but this is a smokescreen: their activities far exceed those limited purposes. Internet Archive unabashedly seeks to provide free and unlimited access to music for everyone, regardless of copyright. As Defendant Kahle has admitted, Internet Archive's stated ambition is to "poison the whole web with our 78s." Association for Recorded Sound Collections, *Mass Digitization of 78 rpm Records*, YOUTUBE (May 11, 2017), https://www.youtube.com/watch?v=GTH5bYDEonY&ab_channel=AssociationforRecordedSoundCollections (Brewster Kahle speaking). In truth, Defendants' malfeasance springs from their disregard for copyright law and the rights of artists and content owners. Internet Archive and the

other Defendants have a long history of opposing, fighting, and ignoring copyright law, proclaiming that their zealotry serves the public good. In reality, Defendants are nothing more than mass infringers.

4.    Nor can Defendants justify their activities as necessary to preserve historical recordings. All of the pre-1972 sound recordings listed on Exhibit A (the "Sound Recordings at Issue"), which is but a small sample of the works Defendants are infringing, are already available for streaming or downloading from numerous services authorized by Plaintiffs. These recordings face no danger of being lost, forgotten, or destroyed.

5.    Plaintiffs are record companies that produce, manufacture, distribute, sell, and license commercial sound recordings, both in the United States and internationally. Through their enormous investments of money, time, and exceptional creative efforts, Plaintiffs and their respective recording artists have developed and marketed some of the world's most popular music for generations. Plaintiffs own and/or control exclusive rights in some of the most famous sound recordings performed by classic artists and contemporary superstars. Their investments and creative efforts have shaped the musical landscape as we know it, both in the United States and around the world.

6.    In 2018, Congress enacted the Orrin G. Hatch–Bob Goodlatte Music Modernization Act ("Music Modernization Act" or "MMA"), extending federal protection to sound recordings created before February 15, 1972. Pub. L. 115-264; *codified in relevant part at 17 U.S.C. § 1401 et seq*. The Music Modernization Act provides that, for sound recordings fixed prior to February 15, 1972, anyone who violates any of the exclusive rights under 17 U.S.C. § 106—including the rights of reproduction, distribution, and performing the protected work

publicly by means of a digital audio transmission—is subject to an action for infringement pursuant to 17 U.S.C. § 1401(a)(1).

7.     Internet Archive's "Great 78 Project" refers to 78 rpm records, which are phonographic records designed to be played at a speed of 78 revolutions per minute.  The 78 rpm record was the industry-standard record format from the early 1900s until the 1950s.  Plaintiffs issued hundreds of thousands of sound recordings in 78 rpm format.

8.     Internet Archive created and now operates the Great 78 Project, a website at https://great78.archive.org/.  The Great 78 website is a massive, unauthorized, digital record store of recordings.  Although Internet Archive describes the Great 78 Project's goal as "the preservation, research and discovery of 78 rpm records," the Great 78 Project is actually an illegal effort to willfully defy copyright law on an astonishing scale.  Internet Archive has copied hundreds of thousands of physical 78 rpm records into digital files and then posted them on its website, where anyone in the world can download or stream them for free.  The Great 78 Project includes hundreds of thousands of recordings from some of the Twentieth Century's most popular musical artists, and Internet Archive has distributed or streamed those files to users millions of times.  To lure customers into this illegal record store, Internet Archive regularly posts advertisements on social media with links to newly added recordings.

9.     By copying 78 rpm physical records of Plaintiffs' protected sound recordings into digital files, Internet Archive has reproduced without authorization those recordings.  By copying those recordings to a server, Internet Archive has further reproduced without authorization Plaintiffs' protected sound recordings.  By transferring copies of those files to members of the public, Internet Archive has reproduced and distributed without authorization Plaintiffs' protected sound recordings.  By streaming those files to members of the public, Internet Archive

has publicly performed by means of a digital audio transmission without authorization Plaintiffs' protected sound recordings.

10.     Internet Archive has not committed this infringement alone.  Defendant Kahle is the Founder, chief executive, and Chair of the Board of Internet Archive.  He directly oversees and manages Internet Archive's activities, including Internet Archive's infringement of Plaintiffs' works through the Great 78 Project.

11.     Kahle uses his personal Foundation, the Kahle/Austin Foundation, to fund Internet Archive's infringement.  Kahle controls the Foundation: he is its President and principal funder.  Through Kahle, the Foundation is fully aware of Internet Archive's infringing activity.  Each webpage from which Internet Archive has streamed or distributed an infringing sound recording identifies the Foundation as the "Digitizing sponsor."

12.     George Blood is a professional audio engineer with experience in preserving and digitizing physical vinyl records.  Blood offers those services through his company, GBLP.  Internet Archive hired Blood and GBLP to convert 78 rpm records, including those containing Plaintiffs' protected sound recordings, into digital format.  Knowing that Internet Archive intended to upload these digital files to its website for anyone to download or stream for free, Blood and GBLP have digitized hundreds of thousands of recordings.  Blood and GBLP employees have been outspoken proponents of the Great 78 Project.  Blood's decades of involvement in the music industry have made him and GBLP acutely aware of copyright law.

13.     Internet Archive has a long history of opposing copyright laws, and seeking to have old recordings pass into the public domain.  Indeed, Internet Archive opposed the Copyright Term Extension Act ("CTEA") that set the current copyright term at life of the author plus seventy years, claiming "[t]he [CTEA] frustrates the Archives' goals of preservation and

universal access . . . ." *Brief of Amicus Curiae the Internet Archive in Support of Petitioners* at 1, *Eldred v. Ashcroft*, 537 U.S. 186 (2003) (No. 01-618).  Internet Archive then filed *amicus* briefs asking the Supreme Court to invalidate the CTEA.  *Id.*; *Brief of Amici Curiae the Internet Archive, Prelinger Archives, and Project Gutenberg Literary Archive Foundation in Support of Petitioners*, *Eldred v. Ashcroft*, 537 U.S. 186 (2003) (No. 01-618).  The Supreme Court rejected those claims.  *Eldred v. Ashcroft*, 537 U.S. 186 (2003).  Internet Archive then filed its own suit challenging the CTEA, which it lost.  *Kahle v. Gonzalez*, 487 F.3d 697 (9th Cir. 2007).  Having failed repeatedly in Congress and the courts, Internet Archive now chooses to simply willfully disobey the copyright laws of which it is acutely aware.

14.    Defendants cannot avoid liability for their willful infringement by claiming fair use.  Not a single one of the four factors enumerated in the Copyright Act favors Defendants.  Defendants' use of the Sound Recordings at Issue is identical to Plaintiffs' use, Defendants use the works in their entirety, the works are unquestionably the most creative type of works worthy of protection, and Defendants' infringement undermines an existing commercial market for selling downloads and licensing streams of the recordings.

15.    This is not the first time Internet Archive has improperly sought to wrap its infringing conduct in the ill-fitting mantle of fair use.  A court in this District recently rejected Internet Archive's attempt to claim fair-use protection for its systematic copying and distribution of copyrighted books.  *Hachette Book Group, et al. v. Internet Archive, et al.*, 20-cv-4160 (JGK), 2023 WL 2623787  (S.D.N.Y. Mar. 24, 2023).

16.    The court in *Hachette* recognized that "[w]hat fair use does not allow . . . is the mass reproduction and distribution of complete copyrighted works in a way that does not transform those works and that creates directly competing substitutes for the originals."  *Id.* at

*15.  That principle applies equally to Defendants' activities here.  Despite *Hachette*'s clear statement of the law, Defendants have continued infringing additional recordings through the Great 78 project in the months since.

17.     Nor do Internet Archive's efforts to brand itself as a library somehow imbue it with any right to digitize and distribute on a mass scale unauthorized copies of sound recordings. Libraries are trusted institutions that serve the communities that fund them.  When Congress contemplated libraries making digital copies under 17 U.S.C. §108, it created targeted limitations to infringement liability—limitations that have no application to Internet Archive's activities, which result in untold numbers of copies being distributed and performed to the public.

18.     Plaintiffs work hard to ensure the widespread, authorized availability and enjoyment of their recorded music.  Plaintiffs currently commercially exploit, and at all relevant times have commercially exploited, all of the Sound Recordings at Issue listed in Exhibit A. Plaintiffs go to great lengths to create and maintain legitimate channels from which customers can lawfully access Plaintiffs' music.  These include streaming services like Spotify, Amazon Music, and Tidal, digital music stores like Apple's iTunes store, and many others.  All of these legitimate channels have agreements with Plaintiffs that authorize the streaming and downloading of Plaintiffs' recordings and compensate Plaintiffs and, by extension, their recording artists, for the use of Plaintiffs' recordings.

19.     When Defendants exploit Plaintiffs' sound recordings without authorization, neither Plaintiffs nor their artists see a dime.  Not only does this harm Plaintiffs and the artists or their heirs by depriving them of compensation, but it undermines the value of music.

20.     Plaintiffs bring this lawsuit to vindicate the rights Congress has granted creators in pre-1972 sound recordings.

## PLAINTIFFS AND THEIR LEGALLY PROTECTED MUSIC

21.     Plaintiffs are engaged in the business of producing, manufacturing, distributing, selling, licensing, and otherwise commercializing sound recordings in the United States and the world through various media.  They invest substantial money, time, effort, and talent in creating, advertising, promoting, selling, and licensing unique and valuable sound recordings embodying the performances of their exclusive and world-class recording artists.  Plaintiffs are the owners of protected rights in, and/or control exclusive rights with respect to, millions of sound recordings (*i.e.*, recorded music), including by some of the most prolific and well-known recording artists throughout the world.

22.     Plaintiff Sony Music Entertainment ("SME") is a Delaware general partnership, the partners of which are citizens of New York and Delaware.  SME's headquarters and principal place of business are located at 25 Madison Avenue, New York, NY 10010.  SME is home to some of the world's most distinguished record labels, including Columbia Records, RCA Records, Sony Nashville, Arista Records, and Epic Records, through which it contracts with its world-class artists.  Columbia Records and RCA Records are among the world's first record labels, dating back to the late 1800s and early 1900s, respectively.

23.     Plaintiff Arista Music ("Arista Music") is a New York partnership with its principal place of business at 25 Madison Avenue, New York, NY 10010.  Arista Music is a subsidiary of SME.

24.     Plaintiff UMG Recordings, Inc. ("UMG") is a Delaware corporation with its principal place of business at 2220 Colorado Avenue, Santa Monica, CA 90404.

25. Plaintiff Capitol Records, LLC ("Capitol Records") is Delaware Limited Liability Company with its principal place of business at 2220 Colorado Avenue, Santa Monica, CA 90404.

26. Plaintiff Concord Bicycle Assets, LLC ("CBA") is a Delaware limited liability company with its principal place of business at 10 Lea Avenue, Suite 300, Nashville, TN 37210.

27. Plaintiff CMGI Recorded Music Assets, LLC ("CMGI") is a Delaware limited liability company with its principal place of business at 10 Lea Avenue, Suite 300, Nashville, TN 37210.

28. Plaintiffs own and/or control in whole or in part the exclusive rights in innumerable sound recordings, including the Sound Recordings at Issue listed in Exhibit A, which are an illustrative and non-exhaustive list of some of Plaintiffs' works infringed by Defendants through the Great 78 Project. Each of the Sound Recordings at Issue has been submitted to and publicly indexed by the U.S. Copyright Office pursuant to 17 U.S.C. § 1401 at least 90 days before they were reproduced, distributed, and/or publicly performed by means of a digital audio transmission by Defendants.

## DEFENDANTS

29. Defendant Internet Archive is a not-for-profit corporation organized under the laws of California with its headquarters at 300 Funston Avenue, San Francisco, CA 94118. Internet Archive is registered with the New York Department of State to transact business and accept service of process within the State of New York.

30. Defendant Kahle/Austin Foundation is a Washington nonprofit corporation organized under the laws of Washington with offices at 17 Walnut Street, Rockland, ME 04841 and 513 Simonds Loop, San Francisco, CA 94129-1787.

31. Defendant Brewster Kahle resides in San Francisco, CA. He is the Founder, chief executive, and Chair of the Board of Defendant Internet Archive. He is the President of Defendant Kahle/Austin Foundation.

32. Defendant George Blood, L.P. is a limited partnership organized under the laws of Pennsylvania with its headquarters at 21 W Highland Avenue, Philadelphia, PA 19118, and its principal place of business at 502 W. Office Center Drive, Fort Washington, PA 19034. GBLP provides archival audio and moving image services, including digitizing audio, video, and film media, as well as migrating data from legacy formats.

33. Defendant George Blood resides in or about Philadelphia, PA. Blood is the President and owner of GBLP.

## JURISDICTION AND VENUE

34. This is a civil action seeking damages and injunctive relief for infringement under the Copyright Act, 17 U.S.C. §§ 101, *et seq*., and the Music Modernization Act, 17 U.S.C. § 1401.

35. This Court has subject matter jurisdiction over this action pursuant to 17 U.S.C. §§ 101, *et seq*., 17 U.S.C. § 1401, and 28 U.S.C. §§ 1331 and 1338, based on federal question jurisdiction.

36. This Court has personal jurisdiction over Internet Archive pursuant to § 302 of New York's Civil Practice Law & Rules. Internet Archive is registered with the New York Department of State to transact business and accept service of process within the State of New York. Internet Archive currently transacts business within the State of New York and this District by, *inter alia*, distributing digital copies of sound recordings (and other content) to New York residents over the Internet, performing sound recordings publicly by means of a digital

audio transmission to New York residents over the Internet, and soliciting and accepting contributions from New York residents to further its digitization, distribution, and public performance sound recordings.

37. Defendants have harmed Plaintiffs in this District because Internet Archive has copied and uploaded Plaintiffs' protected sound recordings to its website, including each of the Sound Recordings at Issue, without permission, and Internet Archive currently distributes and performs publicly by means of a digital audio transmission Plaintiffs' protected sound recordings to users of its website in New York. Since the beginning of 2020, New York residents have downloaded or streamed recordings from the Great 78 Project more than 500,000 times, making New York the state with the second-most total downloads and streams in that time. These infringements have harmed Plaintiffs in New York by displacing New York residents' legitimate sales and streams, thereby depriving Plaintiffs of revenue in New York. Further, the large volume of downloads and streams in New York indicates that Internet Archive knew or should reasonably have expected its conduct to have consequences in New York. By knowing about and materially contributing to Internet Archive's infringements that have harmed Plaintiffs in New York, Defendants Kahle, the Foundation, Blood, and GBLP have also harmed Plaintiffs in New York, and knew or should reasonably expected that their contributions to Internet Archive's infringements would have consequences in New York.

38. Internet Archive derives substantial revenue from interstate and international commerce. According to public filings, Internet Archive has received over $100 million in the last ten years from a national network of supporters, at least some of whom are based in New York, and from the services it sells to clients in New York and all over the United States.

Internet Archive has also received substantial donations of record collections, from donors nationwide and internationally.

39.     Kahle derives substantial revenue from interstate and international commerce. Kahle became wealthy by founding and selling two companies during the 1990s dot-com boom: Wide Area Information Server (WAIS), which was sold to America OnLine, and Alexa Internet, which was sold to Amazon.com in 1999.  Since then, Kahle has derived substantial revenue from a significant portfolio of investments, including the securities of national and international companies.  Further, Kahle, as Founder, chief executive, and Chair of the Board of Internet Archive, shares in the decision-making and execution of, and exercises control over, Internet Archive's transacting business in New York.

40.     The Foundation derives substantial revenue from interstate commerce and international commerce.  According to public filings, the Foundation has generated tens of millions of dollars in revenue from investments in securities of national and international companies, including some based in New York.  Further, while the Foundation is organized under the laws of Washington, it has received tens of millions of dollars in contributions from donors located outside Washington, including from the Kahle Austin Revocable Trust in San Francisco, CA.

41.     GBLP derives substantial revenue from interstate commerce and international commerce.  GBLP's website states: "George Blood LP is a ***nationally recognized*** provider of archival audio and moving image preservation. . . .  [W]e meet the needs of our various clients in libraries, museums, archives, corporations, and private collections ***across the country***." *Careers*, GEORGE BLOOD LP, https://www.georgeblood.com/careers (last visited Aug. 10, 2023) (emphasis added).  In addition, GBLP, which is located in Pennsylvania, has received hundreds

of thousands of dollars in revenue from Internet Archive, which is located in California, in exchange for GBLP's digitization services on the Great 78 Project.

42.     Blood derives substantial revenue from interstate commerce and international commerce.  GBLP's website states: "For more than 35 years George Blood has been delivering professional audio services to musicians, composers, universities, libraries, corporations, and individual clients, ***both nationally and internationally***."  *Experience*, GEORGE BLOOD LP, https://www.georgeblood.com/experience (last visited Aug. 10, 2023) (emphasis added). Further, as the principal of GBLP, Blood has derived substantial revenue from the interstate fees GBLP has collected for its digitization services on the Great 78 Project.

43.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) as a substantial part of the events or omissions giving rise to these claims occurred in this District when tens of thousands of individuals in this District downloaded and/or streamed Plaintiffs' protected sound recordings from Internet Archive.

## FACTUAL BACKGROUND

**A.  In 2018, Congress extended federal protection to pre-1972 sound recordings.**

44.     Prior to 2018, sound recordings created before February 15, 1972, while protected under state law, were not eligible for federal copyright protection.  To address that lacuna in federal copyright law, Congress enacted the Orrin G. Hatch-Bob Goodlatte Music Modernization Act, which went into effect on October 11, 2018.  17 U.S.C. § 1401 *et seq*.  The Music Modernization Act provides that, for sound recordings fixed before February 15, 1972 ("pre-1972 sound recordings"), anyone who violates any of the exclusive rights under 17 U.S.C. § 106—including the rights of reproduction, distribution, and performing the work publicly by means of a digital audio transmission—is subject to the remedies the Copyright Act provides

under sections 502 through 505 and 1203 to the same extent as an infringer of copyright.  17 U.S.C. § 1401(a)(1).

45.     The Music Modernization Act directed the Copyright Office to create a process for rightsholders to submit schedules of pre-1972 sound recordings to the Copyright Office so that the Copyright Office can publicly index the recordings.  17 U.S.C. § 1401(f)(5)(A)(ii).  Once the Copyright Office indexes a work, a rightsholder who sues for infringement of that work can recover statutory damages and attorneys' fees pursuant to 17 U.S.C. §§ 504 and 505.  17 U.S.C. § 1401(f)(5)(A)(i).  All of the Sound Recordings at Issue have been submitted to the Copyright Office and publicly indexed.

46.     The Music Modernization Act creates a safe harbor that potentially immunizes otherwise infringing uses of pre-1972 sound recordings if certain conditions are met.  Noncommercial use of a pre-1972 sound recording is not infringing if (i) the rightsowner is not commercially exploiting the recording, (ii) the user has made a good-faith, reasonable search to determine whether the recording is being commercially exploited, (iii) the user files a notice of noncommercial use with the Copyright Office, _**and**_ (iv) within 90 days of the user's notice, the rightsowner does not file a notice with the Copyright Office opting out of the noncommercial use.  17 U.S.C. § 1401(c)(1)(A)-(C).  The Music Modernization Act further protects "[a] person engaging in a noncommercial use of a sound recording otherwise permitted under this subsection who establishes that the person made a good faith, reasonable search under paragraph (1)(A) without finding commercial exploitation of the sound recording by or under the authority of the rights owner . . . ." 17 U.S.C. § 1401(c)(4)(A).

B. **Internet Archive built a mass infringement platform that flouts the Music Modernization Act.**

47.     Brewster Kahle founded Internet Archive in 1996.  Internet Archive proclaims that its "mission is to provide Universal Access to All Knowledge."  *About the Internet Archive*, INTERNET ARCHIVE, https://archive.org/about/ (last visited Aug. 10, 2023).  Internet Archive provides a number of services not at issue in this action, including its Wayback Machine and digitization of public domain materials.

48.     The Great 78 Project involves creating digital copies of sound recordings fixed in physical 78 rpm records.  Using the services of Blood and GBLP, Internet Archive copies entire sound recordings into various digital formats.

49.     Internet Archive then uploads those digital copies to the Great 78 Project website. Each recording has a separate webpage on the Great 78 Project website, showing the record company that released the sound recording, digitizing sponsor (always the Foundation), contributor (always Internet Archive), uploader, and other metadata.  Each webpage has a built-in audio player that anyone can use to play the recording an unlimited number of times for free. Each webpage has links that anyone can use to download the recording an unlimited number of times for free.  All of the Sound Recordings at Issue were digitized by Blood and GBLP and uploaded to the Great 78 Project website by GBLP and Internet Archive.  The copies of the Sound Recordings at Issue that Internet Archive reproduces, distributes, and performs publicly by means of a digital audio transmission are the same recordings Plaintiffs offer.

50.     The screenshots below show an example of a Great 78 Project webpage for the sound recording, "White Christmas," recorded by Bing Crosby, originally released in 1942 by Decca Records, which is now part of Plaintiff UMG:





*White Christmas by Bing Crosby*, INTERNET ARCHIVE, https://archive.org/details/78_white-christmas_irving-berlin-bing-crosby-ken-darby-singers-john-scott-trotter-and_gbia0000275a.

51.     The hallmark of the Great 78 Project is giving music away for free.  From early on, Internet Archive stated that "[t]he Great 78 Project will collect and digitize over 400,000 digitized 78 rpm recordings to make them ***publicly available***."  Brewster Kahle, *Dreaming of Semantic Audio Restoration at a Massive Scale*, INTERNET ARCHIVE (Jun. 3, 2017),

https://blog.archive.org/2017/06/03/dreaming-of-semantic-audio-restoration-at-a-massive-scale/ (emphasis added).

52.     Internet Archive actively advertises the ability to freely stream and download sound recordings from its collections.  Fundamental to the Great 78 Project is its X (formerly Twitter) account that tweets a link to a different recording every hour.  *See* thegreat78project (@great78project), X, https://twitter.com/great78project.  The X account does not discuss historical facts associated with the recordings; it simply advertises that the recordings are freely available to download or stream and encourages users to go and obtain them.

53.     Internet Archive has also recently added an account on its server hosted on the Mastodon social networking platform that similarly posts a link to a Great 78 Project recording every hour.  *See* thegreat78project (great78@mastodon.archive.org), Mastodon, https://mastodon.archive.org/@great78.

54.     Leaders of the Great 78 Project, including Brewster Kahle and George Blood, have spoken at conferences, appeared on podcasts and radio shows, and given interviews to journalists in order to publicize the Great 78 Project and the wide public availability of protected sound recordings the Great 78 Project provides.

55.     As part of the Great 78 Project, Internet Archive solicits collectors to donate their record collections, with the goal of making as many recordings publicly available as possible.  The Great 78 Project homepage explicitly requests donations of 78 rpm records and links to a page with donation instructions.  *See Donate 78s*, Internet Archive, https://great78.archive.org/donate-78s/ (last visited Aug. 10, 2023).

56.     Internet Archive also solicits monetary donations.  The Internet Archive website has a "Donate" link that leads to a webpage where Brewster Kahle states, "We rely on the

generosity of individuals like you to pay for servers, staff, and preservation projects. If you can't imagine a future without the Internet Archive, please consider supporting our work. . . . If you find our site useful, please chip in! Your support will help us build the web we deserve."

Brewster Kahle, *A Message from Internet Archive Founder, Brewster Kahle*, INTERNET ARCHIVE, https://archive.org/donate (last visited Aug. 10, 2023).

57.    Internet Archive actively uses the music it offers as part of the Great 78 Project to attract new visitors from whom it can solicit donations. When a new user visits any page on the Great 78 website, Internet Archive displays the following banner at the top of the page:



58.    When the Music Modernization Act's enactment made clear that unauthorized copying, streaming, and distributing pre-1972 sound recordings is infringing, Internet Archive made no changes to its activities. Internet Archive did not obtain authorization to use the recordings on the Great 78 Project website. It did not remove any recordings from public access. It did not slow the pace at which it made new recordings publicly available. It did not change its policies regarding which recordings it would make publicly available.

59.    Internet Archive has not filed any notices of non-commercial use with the Copyright Office. Accordingly, the safe harbor set forth in the Music Modernization Act is not applicable to Internet Archive's activities.

60.    Internet Archive knew full well that the Music Modernization Act had made its activities illegal under Federal law. When the Music Modernization Act went into effect, Internet Archive posted about it on its blog. Jeff Kaplan, *The Music Modernization Act is now law which means some pre-1972 music goes public*, INTERNET ARCHIVE (Oct. 15, 2018), https://blog.archive.org/2018/10/15/the-music-modernization-act-is-now-law-which-means-

some-music-goes-public/.  The blog post stated that "the MMA means that libraries can make *some* of these older recordings freely available to the public *as long as we do a reasonable search to determine that they are not commercially available.*"  *Id.* (emphasis added).  The blog post further noted that the MMA "expands an obscure provision of the library exception to US Copyright Law, Section 108(h), to apply to all pre-72 recordings.  *Unfortunately 108(h) is notoriously hard to implement*."  *Id.* (emphasis added).  Brewster Kahle tweeted a link to the blog post.  Brewster Kahle (@brewster_kahle), Twitter (Oct. 15, 2018 11:26 AM), https://twitter.com/brewster_kahle/status/1051856787312271361.

61.    Kahle delivered a presentation at the Association for Recorded Sound Collection's 2019 annual conference titled, "Music Modernization Act 2018.  How it did not go wrong, and even went pretty right."  In the presentation, Kahle stated that, "We Get pre-1972 out-of-print to be 'Library Public Domain'!".  The presentation shows that Kahle, and, by extension, Internet Archive and the Foundation, understood how the Music Modernization Act had changed federal law and was aware the Music Modernization Act had made it unlawful under federal law to reproduce, distribute, and publicly perform pre-1972 sound recordings.

62.    Despite knowing that the Music Modernization Act made its conduct infringing under federal law, Internet Archive ignored the new law and plowed forward as if the Music Modernization Act had never been enacted.

C. **Defendants' infringement is of staggering scale.**

63.    The scope of Defendants' infringement is massive and continually growing.  The Great 78 Project contains more than 400,000 works digitized by Blood and GBLP.  Those works have been downloaded or streamed millions of times.  Internet Archive makes newly available every month thousands of additional recordings digitized by Blood and GBLP.  Internet Archive's stated goal is to digitize and make available for free *every* 78 rpm recording ever

created: George Blood has stated that "[t]his community effort seeks to digitize all 3 million minted sides (~3 minute recordings) published on 78 rpm discs from about 1898 to the 1950s." George Blood, *Boston Public Library - Boston Public Library Transfers Sound Archives Collection to Internet Archive for Digitization, Preservation, and Public Access*, GEORGE BLOOD (Oct. 16, 2017), https://www.georgeblood.com/news/2017/10/16/boston-public-library-boston-public-library-transfers-sound-archives-collection-to-internet-archive-for-digitization-preservation-and-public-access.

64. The recordings available on the Great 78 Project include some of the most popular and famous recordings ever made. "White Christmas," by Bing Crosby, is widely regarded as the best-selling single in the history of recorded music, having sold more than 50 million copies. "White Christmas" was originally released in 1942 by Decca Records, which is now part of Plaintiff UMG. It is available on the Great 78 project in several forms, from where it has been downloaded or streamed tens of thousands of times. *See, e.g., White Christmas by Bing Crosby*, INTERNET ARCHIVE, https://archive.org/details/78_white-christmas_irving-berlin-bing-crosby-ken-darby-singers-john-scott-trotter-and_gbia0000275a.

65. "Young-At-Heart," a classic Frank Sinatra 1953 recording, sold more than one million copies in 1953-54. That recording of "Young At Heart" was originally released by Plaintiff Capitol Records. It is available on the Great 78 Project, from where it has been downloaded or streamed more than 2,300 times. *Young-at-Heart* by Frank Sinatra*; Nelson Riddle;* INTERNET ARCHIVE, https://archive.org/details/78_young-at-heart_frank-sinatra-nelson-riddle-johnny-richards-carolyn-leigh_gbia0012315a (last visited Aug. 10, 2023).

66. "Saturday Night (is the Loneliest Night of the Week)" was a hit for Frank Sinatra in 1945. The recording was originally released by Columbia Records, which is now part of

Sony.  It is available on the Great 78 Project, from where it has been downloaded or streamed hundreds of times.  *Saturday Night (Is The Loneliest Night In The Week)*, INTERNET ARCHIVE, https://archive.org/details/78_saturday-night-is-the-loneliest-night-in-the-week_frank-sinatra-axel-stordahl-cah_gbia0017538a (last visited Aug. 10, 2023); *Saturday Night (Is The Loneliest Night In The Week)*, INTERNET ARCHIVE, https://archive.org/details/78_saturday-night-is-the-loneliest-night-in-the-week_frank-sinatra-axel-stordahl-s_gbia0263662b (last visited Aug. 10, 2023).

67.     "Potato Head Blues," recorded by Louis Armstrong and His Hot Sevens, has been described by critics as Armstrong's "greatest single recording and "one of the most astonishing accomplishments in all of twentieth century music."  Thomas Ward, *Potato Head Blues*, ALLMUSIC, https://www.allmusic.com/song/potato-head-blues-mt0008812467?1691102565959 (last visited Aug. 10, 2023).  It was originally issued in 1927 by Okeh Records, which is now part of Plaintiff SME.  It is available on the Great 78 Project, from where it has been downloaded and streamed hundreds of times.  *Potato Head Blues by Louis Armstrong and His Hot Seven,* INTERNET ARCHIVE,  https://archive.org/details/78_potato-head-blues_louis-armstrong-and-his-hot-seven-armstrong_gbia0261792a (last visited Aug. 10, 2023).

68.     "Monk's Dream," is a seminal 1952 recording by the Thelonius Monk Trio.  It was originally issued by Prestige Records, which is now a part of Plaintiff CMGI.  It is available on the Great 78 Project, from where it has been downloaded and streamed hundreds of times. *Monk's Dream by the Thelonius Monk Trio,* INTERNET ARCHIVE, https://archive.org/details/78_monks-dream_thelonious-monk-trio-thelonious-monk-art-blakey-gary-mapp-monk_gbia0254273b (last visited Aug. 10, 2023).

69. All of these all of these recordings are commercially available for downloading and streaming on numerous popular platforms, such as Spotify and the iTunes store.

**D. Brewster Kahle oversees and directs Internet Archive's infringement.**

70. As Internet Archive's Founder, chief executive, and Chair of the Board, Kahle has been intimately involved in Internet Archive's infringing conduct. According to Internet Archive's IRS filings, Kahle works 40 hours per week for Internet Archive.

71. Kahle's blog posts reveal his deep involvement in the Great 78 Project's operations. At the beginning of the Great 78 Project, Kahle described himself as "creating" the Great 78 Project. Brewster Kahle, *Collector or Digital Librarian?* (Jun. 9, 2017), https://brewster.kahle.org/2017/06/09/collector-or-digital-librarian/. A news article at the time described the Great 78 Project as Kahle's "brainchild." Will Pritchard, *How The Great 78 Project is saving half a million songs from obscurity*, THE VINYL FACTORY, https://thevinylfactory.com/features/great-78-project-archive-interview/ (Aug. 18, 2017). Kahle wrote about the Great 78 Project: "So what is this? A reference collection? A collector's dream? A discovery radio station? The soundtrack of the early 20th century? All Good. All Fun." Brewster Kahle, *The Great 78 Project*, https://brewster.kahle.org/2017/06/09/the-great-78-project/ (Jun. 9, 2017).

72. Kahle does not limit his involvement to high-level guidance, but participates directly in the Great 78 Project's operations. For instance, in 2022, Kahle posted on the Internet Archive's blog asking for advice on how to identify duplicates in the Great 78 Project's archive. Brewster Kahle, *Pythonistas: Up for quick hack to test Dedup'ing 78rpm records using document clustering?*, INTERNET ARCHIVE (Oct. 2, 2022), https://brewster.kahle.org/2022/10/02/pythonistas-up-for-quick-hack-to-test-deduping-78rpm-records-using-document-clustering/. In 2020, Kahle posted that Internet Archive was using a

database called Discogs to bulk-import release dates for 78 rpm records in the Internet Archive's collection.  Brewster Kahle, *Discogs Thank You! A commercial community site with bulk data access*, INTERNET ARCHIVE (Dec. 6, 2020) https://blog.archive.org/2020/12/06/discogs-thank-you-a-commercial-community-site-with-bulk-data-access/.  In 2019, Kahle posted on the Internet Archive's blog about correcting errors in the metadata for sound recordings.  Brewster Kahle, *Correct Metadata is Hard: a Lesson from the Great 78 Project*, INTERNET ARCHIVE (Jul. 14, 2019), https://blog.archive.org/2019/07/14/correct-metadata-is-hard-lessons-from-the-great-78-project/.

73.     Kahle regularly promotes and advocates for the Great 78 Project.  For example, on July 21, 2021 he tweeted, "More 78's to play from our library!  Uploading 9,000+  right now," https://twitter.com/brewster_kahle/status/1405292024106868740, and responded to a query that "The @internetarchive  will pay for shipping, preservation, digitization, and hosting . . . ." .  Brewster Kahle (@brewster_kahle), TWITTER (Jun. 16, 2021 6:31 PM), https://twitter.com/brewster_kahle/status/1405666382339973125.  On Sept. 16, 2020, Kahle quoted a tweet from the Great 78 Project Twitter feed, adding, "[a]nd please donate more 78's if you possibly can, we are running out."  Brewster Kahle (@brewster_kahle), TWITTER (Sep. 16, 2020 9:30 PM), https://twitter.com/brewster_kahle/status/1306405073019236357.  In response to a question, he stated, "We want all 78's we do not already have (or better copies of what we have)."  Brewster Kahle (@brewster_kahle), TWITTER (Sep. 16, 2020 10:49 PM), https://twitter.com/brewster_kahle/status/1306425127878483968.

74.     Kahle has actively advocated against the copyright laws for years.  Kahle has complained that "[c]opyright was twisted in a rewriting of the law in 1976 to put much of the twentieth century into a legal jail."  Brewster Kahle and Ana Parejo Vadillo, *The Internet*

*Archive: An Interview with Brewster Kahle*, 19 INTERDISCIPLINARY STUDIES IN THE LONG

NINETEENTH CENTURY 21 at 4 (2015), *available at* https://19.bbk.ac.uk/article/id/1522.  Kahle

and Internet Archive have filed meritless litigation seeking to evade binding Supreme Court

precedent and undo congressionally enacted copyright law.  *See Kahle v. Gonzalez*, 487 F.3d 697

(9th Cir. 2007) (affirming dismissal of complaint seeking to declare Copyright Term Extension

Act unconstitutional).

    E.  **The Kahle/Austin Foundation sponsors Internet Archive's infringement.**

    75.      Kahle established the Foundation as his and his wife's preferred vehicle for

funding his favored projects, including Internet Archive.  The majority of the Foundation's funds

come directly or indirectly from Kahle.  For example, in 2019, the most recent year for which the

Foundation's tax filings are publicly available, the Foundation received contributions of

$17,588,990, almost all of which came from the Kahle Austin Revocable Trust, a trust controlled

and funded by Kahle.  Similarly, in 2016, the Foundation received contributions of $38,721,865,

almost all of which again came from that same trust controlled and funded by Kahle.

    76.      At Kahle's direction, the Foundation used the funds Kahle had contributed to

sponsor the Internet Archive's massive and growing infringement.  The Foundation donated

money to Internet Archive that Internet Archive used to pay costs in furtherance of its

infringement, such as GBLP's fees for digitizing Plaintiffs' works and employees who uploaded

recordings to the website.  Internet Archive's webpage for each recording at issue highlights the

Foundation's critical contribution by naming the Foundation as the "Digitizing sponsor."  By

virtue of Kahle's central role at both Internet Archive and the Foundation, the Foundation knew

Internet Archive's activities were infringing and knew that Internet Archive was using the

Foundation's funds to support infringement.

## F. **Defendants knew their conduct was infringing.**

77.     Defendants knew full well their conduct was infringing.  In 2020, Kahle acknowledged that building an audio library "is doable.  Except that it's a very heavily litigated area," and that "[e]xactly how to do the distribution on the commercial materials, we haven't quite figured out."  Long Now Foundation, *Universal Access to All Knowledge*, YOUTUBE, https://www.youtube.com/watch?v=RV_ALlJGU_c&ab_channel=LongNowFoundation (May 25, 2020) (Brewster Kahle speaking).

78.     When Internet Archive copied and uploaded sound recordings to its website, it also copied the labels for each of the 78 rpm records and uploaded those labels as well.  Those labels typically bear the name of the record company which released the sound recording.  By looking at these labels, Internet Archive could determine that a record company owned the recordings at issue.

79.     Defendants were notified that their conduct was infringing.  On June 10, 2020, Senator Thom Tillis, then-Chair of the Senate Subcommittee on Intellectual Property, wrote to Kahle and Internet Archive that Internet Archive's "ma[king] recordings available for free through unlimited streaming and download . . . raise numerous potential issues of copyright infringement."  Letter from Sen. Thom Tillis to Brewster Kahle (Jun. 10, 2020) 2.  Senator Tillis explained that Internet Archive's "sound recording projects do not appear to comply with the relevant portions of the Orrin G. Hatch-Bob Goodlatte Music Modernization Act (MMA), which deals only with pre-1972 sound recordings and would not allow for streaming or downloading." *Id.*  Senator Tillis added that "I am concerned that the Internet Archive thinks that it—not Congress—gets to determine the scope of copyright law. . . .  Internet Archive seems to be daring copyright owners to sue to enforce their rights . . . ."  *Id.*

80.     Soon after, on July 22, 2020, the Recording Industry for America ("RIAA") also wrote to Kahle and Internet Archive.  The RIAA is a trade association whose members, including some of the Plaintiffs, create, manufacture and/or distribute sound recordings representing the great majority of all legitimate recorded music consumption in the United States.  The RIAA informed Kahle that "you and Internet Archive (collectively 'you') have reproduced thousands of sound recordings in which RIAA member companies own or exclusively control copyrights, and have made those recordings available to the public for unrestricted download and streaming, all without the consent of the rights owners. . . .  Your unauthorized reproduction, distribution and public performance of these recordings is a plain violation of the RIAA member companies' rights under the [MMA], 17 U.S.C. § 1401, and constitutes nothing less than piracy on a massive scale."  Letter from Ken Doroshow to Brewster Kahle (July 22, 2020) 1-2.  The RIAA demanded that Kahle and Internet Archive immediately cease and desist from their infringement.  *Id.* at 3.

81.     Internet Archive ignored this demand.  On August 21, 2020, Brewster Kahle responded to the RIAA.  Kahle did not—because he could not—dispute the underlying facts that Internet Archive has reproduced thousands of sound recordings in which RIAA member companies own or exclusively control federally protected exclusive rights and made those recordings available to the public for unrestricted download and streaming.  Instead, Kahle tried to excuse this infringement by arguing that "most of the recordings in [the Great 78] collection are obscure and rare," as if making available obscure and rare recordings Plaintiffs own were permissible or could excuse making available popular ones.  Email from Brewster Kahle to Ken Doroshow (August 21, 2020).  Kahle also disingenuously claimed, "to the extent that there may be particular recordings that your members may prefer to have removed from public access

because they are currently being commercially exploited, we work with them according to standard procedures." *Id.* This gets the MMA's burdens backwards—as Kahle well knows, the MMA requires that the ***user*** determine if a work is being commercially exploited, not that the ***owner*** proactively identify works to the user. 17 U.S.C. § 1401I(1)(A)-(C). The MMA is not a notice-and-takedown statute.

82. Internet Archive's conduct evinces its bad faith. The RIAA's letter specifically cited Internet Archive's infringement of "well-known and commercially available recordings by such legendary artists as Elvis Presley, Duke Ellington, Billie Holiday, Ray Charles, Chuck Berry, Frank Sinatra, Ella Fitzgerald, Louis Armstrong, and Hank Williams, to name just a few." Letter from Ken Doroshow to Brewster Kahle (July 22, 2020) 1. Undermining its claim that it works with rightsowners to remove from public access recordings that are currently being commercially exploited, Internet Archive did not remove from public access any recordings by any of the artists cited in the RIAA's letter.

83. In 2021, Internet Archive tweeted that 80% of the 250,000 sides digitized so far "were produced by the 'Big 5' labels": Decca, Columbia, Victor, RCA Victor, and Capitol. Internet Archive (@internetarchive), TWITTER (Apr. 25, 2021 5:13 PM), https://twitter.com/internetarchive/status/1386428082332921857. All five are well-known labels whose recordings are owned by the Plaintiffs in this case.

84. Internet Archive also maintains a collection on its website titled, "Unlocked Recordings." Internet Archive describes this collection as "Recordings made available under the Music Modernization Act. A reasonable search has been conducted to determine that these items are not commercially available." *Unlocked Recordings*, INTERNET ARCHIVE,

https://archive.org/details/unlockedrecordings (last visited Aug. 10, 2023).  Internet Archive makes all of these recordings available for downloading and streaming.

85.     Internet Archive's claim about the Unlocked Collection that "[a] reasonable search has been conducted to determine that these items are not commercially available" is demonstrably false.  On the first page of the Unlocked Recordings collection alone, Internet Archive displays recordings by Paul McCartney, Jimi Hendrix, Nina Simone, and Frank Sinatra.  *See Ram by Paul and Linda McCartney*, INTERNET ARCHIVE, https://archive.org/details/lp_ram_paul-linda-mccartney (last visited Aug. 10, 2023); *Jimi Hendrix by Jimi Hendrix*, INTERNET ARCHIVE, https://archive.org/details/lp_jimi-hendrix_jimi-hendrix (last visited Aug. 10, 2023); *I Put A Spell On You by Nina Simone*, INTERNET ARCHIVE, https://archive.org/details/lp_i-put-a-spell-on-you_nina-simone (last visited Aug. 10, 2023); *Sings Days Of Wine And Roses, Moon River, And Other Academy Award Winner" by Frank Sinatra; Nelson Riddle*, INTERNET ARCHIVE, https://archive.org/details/lp_sings-days-of-wine-and-roses-moon-river-an_frank-sinatra-nelson-riddle (last visited Aug. 10, 2023).  Any reasonable search would have found that these recordings are widely commercially available. Nor has Internet Archive filed a notice of noncommercial use with the Copyright Office regarding any of these so-called Unlocked Recordings (or any other recordings), as the MMA requires.  17 U.S.C. § 1401(c)(1)(B).

86.     Internet Archive's reference to the Music Modernization Act and the required "reasonable search . . . to determine that these items are not commercially available" demonstrates that Internet Archive knows it must conduct searches to see if recordings are commercially exploited as a condition to being eligible for the MMA's safe harbor.  17 U.S.C. § 1401(c)(1)(A).  Internet Archive also knows that it has not met other conditions for immunity

under the MMA, such as filing a notice of noncommercial use with the U.S. Copyright Office. 17 U.S.C. § 1401(c)(1)(B). Accordingly, Internet Archive knows that its use of those recordings is not authorized under the MMA and is infringing.

87.     Internet Archive's users have also questioned the legality of Internet Archive's conduct. One user posted on the Great 78 Project's message forum that "[t]he records I've looked at have no copyright or permission information that I can see . . . . I think that a lot of people . . . are going to assume that because these recordings are freely available in the archive, that they are in the public domain. I think that archive.org ought to be concerned about this." Jon_Corelis, *Copyright and permissions*, INTERNET ARCHIVE (Aug. 13, 2017 7:31 AM), https://archive.org/post/1081837/copyright-and-permissions. In 2019, another user posted, "I have the same questions/concerns." Jwadley, *Re: Copyright and permissions*, INTERNET ARCHIVE (Feb. 8, 2019 12:38 PM), https://archive.org/post/1081837/copyright-and-permissions.

88.     Another user asked what license applied to recordings in the Great 78 Project because the user wanted to upload a version of the recording to a different website. Toiletrolltube, *License Information*, INTERNET ARCHIVE (May 21, 2019 1:24 AM), https://archive.org/post/1101178/license-information. Kahle responded, "on what you can do with materials from the Internet Archive, the Internet Archive are not a good place to ask. You could ask a lawyer, you can look at what others do, but again, we can not offer advice. Sorry to not be of concrete help." Brewster Kahle, *Re: License Information*, INTERNET ARCHIVE (May 21, 2019 9:32 AM), https://archive.org/post/1101178/license-information.

89.     Internet Archive has ignored the Music Modernization Act's safe-harbor requirement that the user make a good faith, reasonable search to determine whether Plaintiffs are commercially exploiting the sound recordings Internet Archive has infringed. The Register

of Copyrights has issued regulations requiring that a reasonable search for purposes of 17 U.S.C § 1401)(c) must include, among other things: (i) searching the Copyright Office's database of indexed schedules listing right owners' pre-1972 sound recordings; (ii) searching Google, Yahoo!, or Bing; (iii) searching at least one of the following streaming services: Amazon Music Unlimited, Apple Music, Spotify, or TIDAL; (iv) searching YouTube; (v) searching SoundExchange's repertoire database; (vi) searching at least one major seller of physical product, namely Amazon.com. 37 CFR § 201.37(C)(1). Any search of these sources would have easily revealed that Plaintiffs commercially exploit all of the Sound Recordings at Issue by making them available for streaming and download at a wide variety of easily accessible commercial outlets. Nor have Defendants filed any notices of noncommercial use for any of the Sound Recordings at Issue. For these reasons alone, Defendants do not qualify for the Music Modernization Act's safe harbor.

90.     Blood and GBLP were aware at all times that Internet Archive was making available the digital files Blood and GBLP were creating for anyone to download or stream for free. Blood and GBLP worked closely with Internet Archive and were deeply involved in the Great 78 Project. GBLP's "About Us" webpage links to the Great 78 Project. *About Us – Projects*, GEORGE BLOOD LP, https://www.georgeblood.com/projects (last visited Aug. 10, 2023). Similarly, the front page of the Great 78 Project links to the GBLP website. THE GREAT 78 PROJECT, https://great78.archive.org/ (last visited Aug. 10, 2023). According to Internet Archive's IRS filings, Internet Archive has paid GBLP hundreds of thousands of dollars per year for GBLP's services.

91.     In 2020, Blood recorded a video for Internet Archive in which he described himself as a "contributor" to the Great 78 Project. *George Blood presents The Great 78 Project*,

INTERNET ARCHIVE (Nov. 6, 2020), https://archive.org/details/george-blood-great-78-project (George Blood speaking). In the video, Blood describes how, in addition to GBLP's digitization work, he gives presentations at conferences to "spread the word" about the Great 78 Project. *Id.* Also in the video, Blood discusses his and GBLP's involvement in the origins and strategy of the Great 78 Project. *Id.* He acknowledges that "80% of the recordings in the Great 78 Project are from just five labels"—Decca, Columbia, Victor, RCA Victor, and Capitol. He also references the Great 78 Project's twitter feed and stated that the Great 78 Project receives 300,000 unique visitors per month. *Id.*

92. When the Great 78 Project tweeted, "5,600 more'78's uploaded over the last week," GBLP replied, "Yahoo! Awesome job by everyone, so happy to contribute to The Great 78 Project!" George Blood LP (@georgebloodlp), TWITTER (Jul. 25, 2018 8:35 AM), https://twitter.com/georgeblood_lp/status/1022098110653378560. In the same 2021 Twitter thread where Internet Archive posted that 80% of the 250,000 sides digitized so far were produced by one of the "Big 5" labels, Internet Archive posted a video showing GBLP's digitization process and GBLP answered questions from users regarding GBLP's archiving techniques. Internet Archive (@internetarchive), TWITTER (Apr. 25, 2021 4:54 PM), https://twitter.com/internetarchive/status/1386423512810721284. News articles about the Great 78 Project's goals and intent to make all recordings in its collection freely available quote Blood extensively. *See, e.g.*, Will Pritchard, *How The Great 78 Project is saving half a million songs from obscurity*, THE VINYL FACTORY, https://thevinylfactory.com/features/great-78-project-archive-interview/ (Aug. 18, 2017).

**G. Defendants' infringement has significantly harmed Plaintiffs.**

93. By reproducing, streaming, and distributing Plaintiffs' works without compensating Plaintiffs, Defendants have significantly harmed Plaintiffs. The millions of

unauthorized infringements of Plaintiffs' sound recordings displace authorized downloads and streams that generate revenues and royalties for Plaintiffs their recording artists (or their heirs). As noted, the Sound Recordings at Issue include some of the most iconic and valuable recordings of all time, by some of the Twentieth Century's most popular artists. These infringements deprive Plaintiffs and those recording artists whose works they sell and license of the compensation to which they are entitled. Further, Internet Archive's offering unlimited downloads and streams for free undermines the value of the recordings. Plaintiffs invest considerable resources in providing and maintaining access in the public digital marketplace to back catalogs of their recordings. Free availability of those recordings undermines those continued investments.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION
**Infringing Reproduction against Internet Archive, Blood, and GBLP**

94.     Plaintiffs repeat and reallege paragraphs 1-94 above as if fully set forth herein.

95.     Plaintiffs own and/or are the exclusive U.S. licensees of the exclusive rights in the Sound Recordings at Issue, which are an illustrative and non-exhaustive list of some of Plaintiffs' works infringed by Defendants through the Great 78 Project. All of the Sound Recordings at Issue have been submitted to and publicly indexed by the U.S. Copyright Office pursuant to 17 U.S.C. § 1401.

96.     By the acts set forth above, Internet Archive, Blood, and GBLP have infringed Plaintiffs' exclusive rights in protected sound recordings, including but not limited to the Sound Recordings at Issue, by reproducing them in violation of 17 U.S.C. §§ 106(1) and 1401(a)(1).

97.     None of Internet Archive, Blood, or GBLP have any authorization, permission, license, or consent to reproduce or otherwise use the Sound Recordings at Issue.

98.     Each such infringement by Internet Archive, Blood, and GBLP constitutes a separate and distinct act of infringement.

99.     Internet Archive, Blood, and GBLP's acts of infringement are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiffs.

100.    As a direct and proximate result of the infringements by Internet Archive, Plaintiffs are entitled to their damages and to Internet Archive, Blood, and GBLP's profits in amounts to be proven at trial, which are not currently ascertainable.  Alternatively, Plaintiffs are entitled to statutory damages of up to $150,000 for each protected sound recording infringed, or in such other amount as may be proper under 17 U.S.C. § 504(c).

101.    Plaintiffs are entitled to attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

102.    As a result of Internet Archive, Blood, and GBLP's conduct, Plaintiffs have sustained and continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Unless enjoined and restrained by this Court, Internet Archive, Blood, and GBLP will continue to infringe Plaintiffs' rights in Plaintiffs' sound recordings. Plaintiffs are entitled to injunctive relief to restrain and enjoin Internet Archive's continuing infringing conduct.

## SECOND CAUSE OF ACTION
### Infringing Reproduction and Distribution against Internet Archive

103.    Plaintiffs repeat and reallege paragraphs 1-94 above as if fully set forth herein.

104.    Plaintiffs own and/or are the exclusive U.S. licensees of the exclusive rights in the Sound Recordings at Issue, which are an illustrative and non-exhaustive list of some of Plaintiffs' works infringed by Defendants through the Great 78 Project.  All of the Sound Recordings at Issue have been submitted to and publicly indexed by the U.S. Copyright Office pursuant to 17 U.S.C. § 1401.

105.     By the acts set forth above, Internet Archive has infringed Plaintiffs' exclusive rights in protected sound recordings, including but not limited to the Sound Recordings at Issue, by reproducing and distributing them to third parties in violation of 17 U.S.C. §§ 106(2) and 1401(a)(1).

106.     Internet Archive does not have any authorization, permission, license, or consent to reproduce, distribute or otherwise use the Sound Recordings at Issue.

107.     Each such infringement by Internet Archive constitutes a separate and distinct act of infringement.

108.     Internet Archive's acts of infringement are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiffs.

109.     As a direct and proximate result of the infringements by Internet Archive, Plaintiffs are entitled to their damages and to Internet Archive's profits in amounts to be proven at trial, which are not currently ascertainable.  Alternatively, Plaintiffs are entitled to statutory damages of up to $150,000 for each protected sound recording infringed, or in such other amount as may be proper under 17 U.S.C. §§ 504(c).

110.     Plaintiffs are entitled to attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

111.     As a result of Internet Archive's conduct, Plaintiffs have sustained and continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Unless enjoined and restrained by this Court, Internet Archive will continue to infringe Plaintiffs' rights in Plaintiffs' sound recordings.  Plaintiffs are entitled to injunctive relief to restrain and enjoin Internet Archive's continuing infringing conduct.

## THIRD CAUSE OF ACTION
**Infringing Public Performance by Means of a Digital Audio Transmission
against Internet Archive**

112.     Plaintiffs repeat and reallege paragraphs 1-94 above as if fully set forth herein.

113.     Plaintiffs own and/or are the exclusive U.S. licensees of the exclusive rights in the Sound Recordings at Issue, which are an illustrative and non-exhaustive list of some of Plaintiffs' works infringed by Defendants through the Great 78 Project.  All of the Sound Recordings at Issue have been submitted to and publicly indexed by the U.S. Copyright Office pursuant to 17 U.S.C. § 1401.

114.     By the acts set forth above, Internet Archive has infringed Plaintiffs' exclusive rights in protected sound recordings, including but not limited to the Sound Recordings at Issue, by performing them publicly by means of a digital audio transmission without authorization in violation of 17 U.S.C. §§ 106(6) and 1401(a)(1).

115.     Internet Archive does not have any authorization, permission, license, or consent to perform publicly by means of a digital transmission or otherwise use the Sound Recordings at Issue.

116.     Each such infringement by Internet Archive constitutes a separate and distinct act of infringement.

117.     Internet Archive's acts of infringement are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiffs.

118.     As a direct and proximate result of the infringements by Internet Archive, Plaintiffs are entitled to their damages and to Internet Archive's profits in amounts to be proven at trial, which are not currently ascertainable.  Alternatively, Plaintiffs are entitled to statutory

damages of up to $150,000 for each protected sound recording infringed, or in such other amount as may be proper under 17 U.S.C. §§ 504(c).

119. Plaintiffs are entitled to attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

120. As a result of Internet Archive's conduct, Plaintiffs have sustained and continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. Unless enjoined and restrained by this Court, Internet Archive will continue to infringe Plaintiffs' rights in Plaintiffs' sound recordings. Plaintiffs are entitled to injunctive relief to restrain and enjoin Internet Archive's continuing infringing conduct.

## FOURTH CAUSE OF ACTION
### Contributory Infringement against Internet Archive

121. Plaintiffs repeat and reallege paragraphs 1-94 above as if fully set forth herein.

122. Plaintiffs own and/or are the exclusive U.S. licensees of the exclusive rights in the Sound Recordings at Issue, which are an illustrative and non-exhaustive list of some of Plaintiffs' works infringed by Defendants through the Great 78 Project. All of the Sound Recordings at Issue have been submitted to and publicly indexed by the U.S. Copyright Office pursuant to 17 U.S.C. § 1401.

123. By the acts set forth above, Plaintiffs' exclusive rights in protected sound recordings, including but not limited to the Sound Recordings at Issue, have been infringed by unlawful reproductions and/or public performances by means of a digital audio transmission of Plaintiffs' protected works without authorization in violation of 17 U.S.C. §§ 106 and 1401(a)(1).

124. The reproductions and/or public performances by means of a digital audio transmission described herein lack any authorization, permission, license, or consent to

reproduce, distribute, perform publicly by means of a digital audio transmission, or otherwise use the Sound Recordings at Issue.

125.    Internet Archive is contributorily liable for the direct infringements described herein.  As a result of its close involvement in and funding and oversight of Blood's and GBLP's reproductions, Internet Archive has actual knowledge, or reason to know, of Blood's and GBLP's infringing activity.  By providing Blood and GBLP the 78 rpm discs embodying Plaintiffs' sound recordings to reproduce, Internet Archive knows specifically the works Blood and GBLP are reproducing.  Internet Archive intends and knows that Blood and GBLP continue to reproduce Plaintiffs' protected sound recordings without authorization.  By providing Blood and GBLP the 78 rpm discs to reproduce, and instructing and working closely with Blood and GBLP to reproduce Plaintiffs' protected sound recordings without authorization, including the Sound Recordings at Issue, Internet Archive facilitates, encourages, and materially contributes to Blood and GBLP's direct infringement of Plaintiffs' protected sound recordings.

126.    By virtue of overseeing and funding Blood and GBLP's reproductions, Internet Archive has the ability to stop Blood and GBLP's infringement of Plaintiffs' protected sound recordings.  Internet Archive fails to do so, and instead purposefully and knowingly continues to facilitate, encourage, and materially contribute to Blood and GBLP's infringement as described herein.  By contracting with and instructing Blood and GBLP to reproduce Plaintiffs' protected sound recordings without authorization, Internet Archive induces Blood and GBLP's infringing reproductions.

127.    By providing a platform where Plaintiffs' protected sound recordings can be downloaded and streamed, and widely advertising those capabilities, Internet Archive has actual knowledge, or reason to know, of infringing activity.  Internet Archive intends and knows that

Plaintiffs' protected sound recordings will continue to be reproduced and performed publicly by means of a digital audio transmission without authorization. By advertising specific sound recordings on its social media accounts, complete with information including the record company that released the recording, Internet Archive has actual knowledge of the infringements of specific works. By providing a platform where Plaintiffs' protected sound recordings are reproduced and performed publicly by means of a digital audio transmission without authorization, Internet Archive facilitates, encourages, and materially contributes to the direct infringement of Plaintiffs' protected sound recordings.

128.    By virtue of providing the facilities that enable infringement, Internet Archive has the ability to stop the reproduction and public performance by means of a digital audio transmission of Plaintiffs' protected sound recordings. Internet Archive fails to do so, and instead purposefully and knowingly continues to facilitate, encourage, and materially contribute to the infringement as described herein.

129.    Each infringement of Plaintiffs' protected sound recordings constitutes a separate and distinct act of infringement.

130.    Internet Archive's acts of infringement are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiffs.

131.    As a direct and proximate result of the infringements by Internet Archive, Plaintiffs are entitled to their damages and to Internet Archive's profits in amounts to be proven at trial, which are not currently ascertainable. Alternatively, Plaintiffs are entitled to statutory damages of up to $150,000 for each protected sound recording infringed, or in such other amount as may be proper under 17 U.S.C. § 504(c).

132.    Plaintiffs are entitled to attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

133.     As a result of Internet Archive's conduct, Plaintiffs have sustained and continue
to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy
at law.  Unless enjoined and restrained by this Court, Internet Archive will continue to infringe
Plaintiffs' rights in Plaintiffs' sound recordings.  Plaintiffs are entitled to injunctive relief to
restrain and enjoin Internet Archive's continuing infringing conduct.

134.     Plaintiffs plead this cause of action in the alternative, in the event that Internet
Archive is held not liable for directly infringing Plaintiffs' exclusive rights in in protected sound
recordings, including but not limited to the Sound Recordings at Issue.

## FIFTH CAUSE OF ACTION
### Inducement of Infringement against Internet Archive

135.     Plaintiffs repeat and reallege paragraphs 1-94 above as if fully set forth herein.

136.     Plaintiffs own and/or are the exclusive U.S. licensees of the exclusive rights in the
Sound Recordings at Issue, which are an illustrative and non-exhaustive list of some of
Plaintiffs' works infringed by Defendants through the Great 78 Project.  All of the Sound
Recordings at Issue have been submitted to and publicly indexed by the U.S. Copyright Office
pursuant to 17 U.S.C. § 1401.

137.     By the acts set forth above, Plaintiffs' exclusive rights in protected sound
recordings, including but not limited to the Sound Recordings at Issue, have been infringed by
the unlawful reproductions and/or public performances by means of a digital audio transmission
of Plaintiffs' protected works without authorization in violation of 17 U.S.C. §§ 106 and
1401(a)(1).

138.     The reproductions and/or public performances by means of a digital audio
transmission described herein lack any authorization, permission, license, or consent to

reproduce, distribute, perform publicly by means of a digital audio transmission, or otherwise use the Sound Recordings at Issue.

139. Internet Archive is liable for inducing the direct infringements described herein. Internet Archive operates the Great 78 Project with the object of promoting the Great 78 Project's use to infringe the protected sound recordings of Plaintiffs and others. Internet Archive's inducement of infringement is obvious from, among other things, Internet Archive's publishing a separate webpage for each sound recording, where the page's primary functionality is to enable streaming and downloading of that sound recording, and Internet Archive's advertising, via its social media platforms and otherwise, the Great 78 Project as a site to stream and download sound recordings. Through these activities, among others, Internet Archive knowingly and intentionally entices, persuades, and causes streaming and downloading, without authorization, of Plaintiffs' protected sound recordings, including but not limited to the Sound Recordings at Issue.

140. Each infringement of Plaintiffs' protected sound recordings constitutes a separate and distinct act of infringement.

141. Internet Archive's acts of infringement are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiffs.

142. As a direct and proximate result of the infringements by Internet Archive, Plaintiffs are entitled to their damages and to Internet Archive's profits in amounts to be proven at trial, which are not currently ascertainable. Alternatively, Plaintiffs are entitled to statutory damages of up to $150,000 for each protected sound recording infringed, or in such other amount as may be proper under 17 U.S.C. § 504(c).

143. Plaintiffs are entitled to attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

144.    As a result of Internet Archive's conduct, Plaintiffs have sustained and continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Unless enjoined and restrained by this Court, Internet Archive will continue to infringe Plaintiffs' rights in Plaintiffs' sound recordings.  Plaintiffs are entitled to injunctive relief to restrain and enjoin Internet Archive's continuing infringing conduct.

145.    Plaintiffs plead this cause of action in the alternative, in the event that Internet Archive is held not liable for directly infringing Plaintiffs' exclusive rights in protected sound recordings, including but not limited to the Sound Recordings at Issue.

## SIXTH CAUSE OF ACTION
### Vicarious Infringement against Internet Archive

146.    Plaintiffs repeat and reallege paragraphs 1-94 above as if fully set forth herein.

147.    Plaintiffs own and/or are the exclusive U.S. licensees of the exclusive rights in the Sound Recordings at Issue, which are an illustrative and non-exhaustive list of some of Plaintiffs' works infringed by Defendants through the Great 78 Project.  All of the Sound Recordings at Issue have been submitted to and publicly indexed by the U.S. Copyright Office pursuant to 17 U.S.C. § 1401.

148.    By the acts set forth above, Plaintiffs' exclusive rights in protected sound recordings, including but not limited to the Sound Recordings at Issue, have been infringed by unlawful reproductions and/or performing public performances by means of a digital audio transmission of Plaintiffs' protected works without authorization in violation of 17 U.S.C. §§ 106 and 1401(a)(1).

149.    The reproductions and/or public performances by means of a digital audio transmission described herein lack any authorization, permission, license, or consent to

reproduce or perform publicly by means of a digital audio transmission, or otherwise use the Sound Recordings at Issue.

150. Internet Archive is vicariously liable for the direct infringements described herein. Internet Archive has the legal and practical right and ability to supervise and control infringement because Internet Archive can choose whether to allow Plaintiffs' protected sound recordings to be streamed and downloaded from its website. By virtue of providing the platform that enables infringement, Internet Archive has had at all relevant times the ability to stop the reproduction and public performance by means of a digital audio transmission of Plaintiffs' protected sound recordings by withdrawing those facilities.

151. Internet Archive derives an obvious and direct financial benefit from the infringement because the ability to use Internet Archive to illegally download Plaintiffs' copyrighted works serves to draw a much greater audience to Internet Archive's website. Recognizing that the availability of Plaintiffs' protected sound recordings is a draw to its site, Internet Archive widely advertises that availability, both through its social media platforms and otherwise. Internet Archive uses the availability of Plaintiffs' protected sound recordings and the increased attention that availability attracts to solicit increased donations of both money and of additional 78 rpm records to add to its collections. Further, Internet Archive derives a direct financial benefit by avoiding paying licensing fees to Plaintiffs it would otherwise have been required to pay in order to exploit Plaintiffs' recordings.

152. Each infringement of Plaintiffs' protected sound recordings constitutes a separate and distinct act of infringement.

153. Internet Archive's acts of infringement are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiffs.

154.    As a direct and proximate result of the infringements by Internet Archive, Plaintiffs are entitled to their damages and to Internet Archive's profits in amounts to be proven at trial, which are not currently ascertainable.  Alternatively, Plaintiffs are entitled to statutory damages of up to $150,000 for each protected sound recording infringed, or in such other amount as may be proper under 17 U.S.C. § 504(c).

155.    Plaintiffs are entitled to attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

156.    As a result of Internet Archive's conduct, Plaintiffs have sustained and continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Unless enjoined and restrained by this Court, Internet Archive will continue to infringe Plaintiffs' rights in Plaintiffs' sound recordings.  Plaintiffs are entitled to injunctive relief to restrain and enjoin Internet Archive's continuing infringing conduct.

157.    Plaintiffs plead this cause of action in the alternative, in the event that Internet Archive is held not liable for directly infringing Plaintiffs' exclusive rights in protected sound recordings, including but not limited to the Sound Recordings at Issue.

## SEVENTH CAUSE OF ACTION
### Contributory Infringement against Kahle

158.    Plaintiffs repeat and reallege paragraphs 1-94 above as if fully set forth herein.

159.    Plaintiffs own and/or are the exclusive U.S. licensees of the exclusive rights in the Sound Recordings at Issue, which are an illustrative and non-exhaustive list of some of Plaintiffs' works infringed by Defendants through the Great 78 Project.  All of the Sound Recordings at Issue have been submitted to and publicly indexed by the U.S. Copyright Office pursuant to 17 U.S.C. § 1401.

160.    By the acts set forth above, Plaintiffs' exclusive rights in protected sound recordings, including but not limited to the Sound Recordings at Issue, have been infringed by

the unlawful reproduction, distribution, and/or public performance by means of a digital audio transmission of Plaintiffs' protected works without authorization in violation of 17 U.S.C. §§ 106 and 1401(a)(1).

161.   The reproductions, distributions, and/or public performances by means of a digital audio transmission described herein lack any authorization, permission, license, or consent to reproduce, distribute, perform publicly by means of a digital audio transmission, or otherwise use the Sound Recordings at Issue.

162.   Kahle is contributorily liable for the direct infringements described herein.  As a result of his close involvement in and oversight of Internet Archive's operations, Kahle has actual knowledge, or reason to know, of the infringing activity.  Kahle intends and knows that Plaintiffs' protected sound recordings continue to be copied, distributed, and performed publicly by means of a digital audio transmission without authorization.  By managing Internet Archive's operations and directing Internet Archive's infringing conduct, Kahle facilitates, induces, encourages, and materially contributes to the direct infringement of Plaintiffs' sound recordings.

163.   By virtue of his dominant leadership role within Internet Archive, Kahle has the ability to direct the cessation of copying, distributing, and publicly performing by means of a digital audio transmission Plaintiffs' protected sound recordings.  Kahle fails to do so, and instead purposefully and knowingly continues to facilitate, induce, encourage, and materially contribute to the infringement as described herein.

164.   Each infringement of Plaintiffs' protected sound recordings constitutes a separate and distinct act of infringement.

165.   Kahle's acts of infringement are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiffs.

166.    As a direct and proximate result of the infringements by Kahle, Plaintiffs are entitled to their damages and to Kahle's profits in amounts to be proven at trial, which are not currently ascertainable.  Alternatively, Plaintiffs are entitled to statutory damages of up to $150,000 for each protected sound recording infringed, or in such other amount as may be proper under 17 U.S.C. § 504(c).

167.    Plaintiffs are entitled to attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

168.    As a result of Kahle's conduct, Plaintiffs have sustained and continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. Unless enjoined and restrained by this Court, Kahle will continue to infringe Plaintiffs' rights in Plaintiffs' sound recordings.  Plaintiffs are entitled to injunctive relief to restrain and enjoin Kahle's continuing infringing conduct.

## EIGHTH CAUSE OF ACTION
### Contributory Infringement against the Foundation

169.    Plaintiffs repeat and reallege paragraphs 1-94 above as if fully set forth herein.

170.    Plaintiffs own and/or are the exclusive U.S. licensees of the exclusive rights in the Sound Recordings at Issue, which are an illustrative and non-exhaustive list of some of Plaintiffs' works infringed by Defendants through the Great 78 Project.  All of the Sound Recordings at Issue have been submitted to and publicly indexed by the U.S. Copyright Office pursuant to 17 U.S.C. § 1401.

171.    By the acts set forth above, Plaintiffs' exclusive rights in protected sound recordings, including but not limited to the Sound Recordings at Issue, have been infringed by the unlawful reproduction, distribution, and/or public performance by means of a digital audio transmission of Plaintiffs' protected works without authorization in violation of 17 U.S.C. §§ 106 and 1401(a)(1).

172.     The reproductions, distributions, and/or public performances by means of a digital audio transmission described herein lack any authorization, permission, license, or consent to reproduce, distribute, perform publicly by means of a digital audio transmission, or otherwise use the Sound Recordings at Issue .

173.     The Foundation is contributorily liable for the direct infringements described herein.  By virtue of Kahle's roles as both Digital Librarian and Chair of the Board of Internet Archive and as President of the Foundation, and Kahle's close involvement in the affairs of both Internet Archive and the Foundation, the Foundation has actual knowledge, or reason to know, of the infringing activity.  The Foundation intends and knows that Plaintiffs' protected sound recordings are reproduced, distributed, and performed publicly by means of a digital audio transmission without authorization.  The Foundation facilitates, encourages, and materially contributes to the direct infringement of Plaintiffs' protected sound recordings by financially sponsoring and specifically funding the infringement, all while knowing and intending that such funds are used to infringe Plaintiffs' protected sound recordings.

174.     Each infringement of Plaintiffs' protected sound recordings constitutes a separate and distinct act of infringement.

175.     The Foundation's acts of infringement are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiffs.

176.     As a direct and proximate result of the infringements by the Foundation, Plaintiffs are entitled to their damages and to the Foundation's profits in amounts to be proven at trial, which are not currently ascertainable.  Alternatively, Plaintiffs are entitled to statutory damages of up to $150,000 for each protected sound recording infringed, or in such other amount as may be proper under 17 U.S.C. § 504(c).

177.    Plaintiffs are entitled to attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

178.    As a result of the Foundation's conduct, Plaintiffs have sustained and continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Unless enjoined and restrained by this Court, the Foundation will continue to infringe Plaintiffs' rights in Plaintiffs' sound recordings.  Plaintiffs are entitled to injunctive relief to restrain and enjoin the Foundation's continuing infringing conduct.

**NINTH CAUSE OF ACTION**
**Contributory Infringement against Blood and GBLP**

179.    Plaintiffs repeat and reallege paragraphs 1-94 above as if fully set forth herein.

180.    Plaintiffs own and/or are the exclusive U.S. licensees of the exclusive rights in the Sound Recordings at Issue, which are an illustrative and non-exhaustive list of some of Plaintiffs' works infringed by Defendants through the Great 78 Project.  All of the Sound Recordings at Issue have been submitted to and publicly indexed by the U.S. Copyright Office pursuant to 17 U.S.C. § 1401.

181.    By the acts set forth above, Plaintiffs' exclusive rights in protected sound recordings, including but not limited to the Sound Recordings at Issue, have been infringed by the unlawful reproduction, distribution, and/or public performance by means of a digital audio transmission of Plaintiffs' protected works without authorization in violation of 17 U.S.C. §§ 106 and 1401(a)(1).

182.    The reproductions, distributions, and/or public performances by means of a digital audio transmission described herein lack any authorization, permission, license, or consent to reproduce, distribute, perform publicly by means of a digital audio transmission, or otherwise use the Sound Recordings at Issue.

183. Blood and GBLP are contributorily liable for the direct infringements described herein.  As a result of Blood and GBLP's close working relationship with Internet Archive, Blood and GBLP have actual knowledge, or reason to know, of the infringing activity.  Blood and GBLP intend and know that Plaintiffs' protected sound recordings are reproduced, distributed, and performed publicly by means of a digital transmission without authorization.  Blood and GBLP facilitate, encourage, and materially contribute to the direct infringement of Plaintiffs' sound recordings by copying physical 78 rpm records into digital files that can be reproduced, distributed, and publicly performed by means of a digital audio transmission.

184. Each infringement of Plaintiffs' protected sound recordings constitutes a separate and distinct act of infringement.

185. Blood and GBLP's acts of infringement are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiffs.

186. As a direct and proximate result of the infringements by Blood and GBLP, Plaintiffs are entitled to their damages and to Blood and GBLP's profits in amounts to be proven at trial, which are not currently ascertainable.  Alternatively, Plaintiffs are entitled to statutory damages of up to $150,000 for each protected sound recording infringed, or in such other amount as may be proper under 17 U.S.C. § 504(c).

187. Plaintiffs are entitled to attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

188. As a result of Blood and GBLP's conduct, Plaintiffs have sustained and continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Unless enjoined and restrained by this Court, Blood and GBLP will continue to infringe Plaintiffs' rights in Plaintiffs' sound recordings.  Plaintiffs are entitled to injunctive relief to restrain and enjoin Blood and GBLP's continuing infringing conduct.

## TENTH CAUSE OF ACTION
### Vicarious Infringement against Blood

189.     Plaintiffs repeat and reallege paragraphs 1-94 above as if fully set forth herein.

190.     Plaintiffs own and/or are the exclusive U.S. licensees of the exclusive rights in the Sound Recordings at Issue, which are an illustrative and non-exhaustive list of some of Plaintiffs' works infringed by Defendants through the Great 78 Project.  All of the Sound Recordings at Issue have been submitted to and publicly indexed by the U.S. Copyright Office pursuant to 17 U.S.C. § 1401.

191.     By the acts set forth above, GBLP has infringed Plaintiffs' exclusive rights in protected sound recordings, including but not limited to the Sound Recordings at Issue, by reproducing them in violation of 17 U.S.C. §§ 106(1) and 1401(a)(1).

192.     Neither GBLP nor Blood has any authorization, permission, license, or consent to reproduce or otherwise use the Sound Recordings at Issue.

193.     Blood is vicariously liable for the direct infringements of GBLP described herein. As President and owner of GBLP, Blood has had at all relevant times the right and ability to supervise the infringing conduct of GBLP and its employees and to direct GBLP and its employees to cease infringing.  Further, as the owner of GBLP, Blood receives a direct financial benefit from GBLP's infringement, as GBLP has been paid hundreds of thousands of dollars to reproduce Plaintiffs' protected sound recordings, and profits from those fees flow through to Blood.

194.     Each infringement of Plaintiffs' protected sound recordings constitutes a separate and distinct act of infringement.

195.     Blood's acts of infringement are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiffs.

196. As a direct and proximate result of the infringements by Blood, Plaintiffs are entitled to their damages and to Blood's profits in amounts to be proven at trial, which are not currently ascertainable. Alternatively, Plaintiffs are entitled to statutory damages of up to $150,000 for each protected sound recording infringed, or in such other amount as may be proper under 17 U.S.C. § 504(c).

197. Plaintiffs are entitled to attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

198. As a result of Blood's conduct, Plaintiffs have sustained and continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. Unless enjoined and restrained by this Court, Blood will continue to infringe Plaintiffs' rights in Plaintiffs' sound recordings. Plaintiffs are entitled to injunctive relief to restrain and enjoin Blood's continuing infringing conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request a judgment in their favor and against Defendants as follows:

A. For a declaration that Defendants have willfully infringed Plaintiffs' protected sound recordings, including the Sound Recordings at Issue;

B. For statutory damages pursuant to 17 U.S.C. § 504(c), in an amount up to the maximum provided by law, arising from Defendants' willful violations of Plaintiffs' rights, including in an amount up to $150,000 per work infringed; or, in the alternative, at Plaintiffs' election, Plaintiffs' actual damages pursuant to 17 U.S.C. § 504(b), including Defendants' profits from infringement, in an amount to be proven at trial;

C. For such equitable relief under Title 17, Title 28, and/or the Court's inherent authority as is necessary to prevent or restrain infringement of Plaintiffs' protected sound recordings, including a permanent injunction requiring that Defendants and their officers, agents, servants, employees, attorneys, directors, successors, assigns, licensees, and all others in active concert or participation with any of them, cease infringing, or causing, aiding, enabling, facilitating, encouraging, promoting, inducing, or materially contributing to or participating in the infringement of any of Plaintiffs' exclusive rights under federal law, including without limitation in the sound recordings in Exhibit A;

D. For an award of Plaintiffs' costs and disbursements in this action, including reasonable attorney's fees, pursuant to 17 U.S.C. § 505;

E. For an award of pre-judgment and post-judgment interest, to the fullest extent available, on any monetary award made part of the judgment against Defendants; and

F. For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby respectfully demand a jury trial on all issues so triable in this action.

Dated: August 11, 2023                     OPPENHEIM + ZEBRAK, LLP

                                            _/s/ Matthew J. Oppenheim_
                                            Matthew J. Oppenheim
                                            Corey Miller
                                            Danae Tinelli
                                            4530 Wisconsin Avenue, NW, Fifth Floor
                                            Washington, DC 20016
                                            Tel:  202-480-2999
                                            matt@oandzlaw.com
                                            corey@oandzlaw.com
                                            danae@oandzlaw.com

*Attorneys for Plaintiffs*